IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs May 20, 2014

**BRADLEY WAYNE ADAMS v. STATE OF TENNESSEE**

**Appeal from the Circuit Court for McMinn County**
**No. 12CR103     Carroll L. Ross, Judge**

_____

**No. E2013-01928-CCA-R3-PC - Filed June 30, 2014**

_____

Bradley Wayne Adams ("the Petitioner") pleaded guilty to one count each of second degree murder and aggravated assault. The Petitioner subsequently filed for post-conviction relief, alleging ineffective assistance of counsel. Following a hearing, the post-conviction court denied relief. The Petitioner now appeals. Upon our thorough review of the record and applicable law, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment**
**of the Circuit Court Affirmed**

JEFFREY S. BIVINS, J., delivered the opinion of the Court, in which THOMAS T. WOODALL and D. KELLY THOMAS, JR., JJ., joined.

Richard Hughes, Cleveland, Tennessee, for the appellant, Bradley Wayne Adams.

Robert E. Cooper, Jr., Attorney General and Reporter; Lacy Wilber, Assistant Attorney General; Steven Bebb, District Attorney General; and Steve Morgan, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**Factual and Procedural Background**

A McMinn County Grand Jury indicted the Petitioner on one count of first degree murder and one count of attempted first degree murder. The Petitioner pleaded guilty on April 11, 2011, to one count of second degree murder and one count of aggravated assault. We summarize the factual basis for the plea set forth by the State at the plea submission hearing as follows:

On June 23, 2009, officers with the Athens Police Department ("APD") responded to a report of gunshots fired in a residence located at 625 Virginia Avenue ("the residence"). Upon arrival, the officers went inside the residence and discovered the victim, Michael Hewitt, unresponsive with a gunshot wound to the back right portion of his head. Hewitt was transported to the hospital and eventually died. A subsequent autopsy revealed that Hewitt died from a single gunshot wound to his head.

James Arwood, who was present at the scene during the shooting, made a statement to police. According to Arwood, he was with Hewitt and Chase Bevis at the residence when the Petitioner arrived with Scotty Miller. At the time that he arrived, the Petitioner's hand was wounded, apparently from a gunshot. The Petitioner stated that he had been shot in the hand and that he was looking for the shooter. Arwood was with Bevis in the living room when they heard a gunshot. After the gunshot, they heard the Petitioner ask, "Who else wants some?" At that point, Bevis attempted to subdue the Petitioner and take the gun away from him. During the struggle, a second shot struck Bevis in the abdomen. At that time, the Petitioner and Miller both fled the residence.

In his statement to police, Miller claimed that he had driven with the Petitioner to the residence. The Petitioner already had the gunshot wound on his hand at the time Miller picked him up. According to Miller, the Petitioner recently had been involved in a physical altercation with unknown individuals. Miller believed that the Petitioner's reason for going to the residence was to confront those who he believed had been involved in the previous altercation. Miller witnessed the Petitioner shoot Hewitt.

Bevis also made a statement to police. According to Bevis, he was inside the residence in question when the Petitioner and Miller arrived. Bevis recalled hearing the Petitioner ask, "Who done this to me?" while holding up his wounded hand. Hewitt led the Petitioner to the bathroom, apparently in an attempt to help the Petitioner tend to his wound. After they returned from the bathroom, Bevis witnessed the Petitioner pull out a handgun and shoot Hewitt in the head. Bevis lunged towards the Petitioner in an attempt to subdue him and gain control of the gun. During that struggle, Bevis was shot in the abdomen. After the Petitioner fled, Bevis drove himself to the hospital.

The Petitioner was taken into custody and made a statement to police. According to the Petitioner, there was a "shootout" at the residence, during which he fired his gun and was also shot in the hand.

An investigation of the scene uncovered a Colt .380 handgun and two spent .380 caliber shells.

Pursuant to the plea agreement, the trial court sentenced the Petitioner to twenty five years' incarceration on his conviction for second degree murder and three years' incarceration on his conviction for aggravated assault. The trial court ordered that the two sentences run consecutively for a total effective sentence of twenty eight years' incarceration. The Petitioner subsequently filed for post-conviction relief, alleging that his counsel at trial ("Trial Counsel") was ineffective. An evidentiary hearing was held on the Petitioner's claim for post-conviction relief, and the following evidence was adduced:

Vickie Adams, the Petitioner's mother, testified that she hired Trial Counsel to represent the Petitioner. At the time Adams hired Trial Counsel, she explained to him that the Petitioner had a "history of the mental problems from early on." There were times during the Petitioner's childhood when he was hospitalized "[b]ecause of his behavior." Adams testified that she became aware that the Petitioner had a substance abuse problem when he was sixteen years old.

Dr. John Harrison, a forensic toxicologist with the Tennessee Bureau of Investigation ("TBI"), identified a report showing the results of a blood analysis performed on a sample of the Petitioner's blood taken approximately two hours after the shooting. The analysis concluded that the Petitioner's blood alcohol content was .07 at the time it was drawn. Therefore, Dr. Harrison deduced that the Petitioner's blood alcohol content could have been "a .09 to a .11, with an average of a .10 back to the time of the incident." Dr. Harrison also identified a report of a toxicology analysis performed on the same sample. That report concluded that the Petitioner's blood tested positive for the presence of alprazolam and methadone. He testified that the amount of methadone present in the Petitioner's blood "would be less than a therapeutic range." However, the amount of alprazolam present was in the "high range," which, combined with the alcohol, would have caused "pronounced" impairment. He could not recall having spoken with Trial Counsel about the instant case.

Trial Counsel testified that, prior to being retained for the instant case, he previously had represented the Petitioner on an unrelated criminal matter. He was "very much" aware of the Petitioner's history of substance abuse and mental illness. A mental evaluation had been performed on the Petitioner subsequent to his arrest, and that report concluded that the Petitioner was mentally competent to stand trial. When Trial Counsel began meeting with the Petitioner regarding the instant case, he had "numerous concerns" about the Petitioner's "mental health in general, particularly, as it related to defending his case, and avenues that we might approach for a defense strategy." However, he did not have concerns about the Petitioner's competency.

Trial Counsel testified that the Petitioner informed him of certain voice mails, allegedly containing threats, that were left on the Petitioner's cell phone by Hewitt. He recalled having multiple conversations with the Petitioner regarding the voice mails;

however, he personally had not listened to them. The Petitioner also asked him to investigate the crime scene. Specifically, the Petitioner claimed that Hewitt kept several guns hidden in the residence. However, Trial Counsel did not investigate the crime scene prior to the Petitioner's plea.

Trial Counsel testified that he ordered an independent mental evaluation of the Petitioner, which was performed by Dr. Kimberly Brown. Trial Counsel considered utilizing an expert to assert that the Petitioner's mental state at the time of the shooting did not rise to a level of premeditation. However, in her report following that evaluation, which was entered into evidence at the hearing, Dr. Brown concluded that "the available evidence [did] not support a mental defense." Furthermore, due to the Petitioner's behavior on the day of the shootings, Dr. Brown could not conclude that the Petitioner was too impaired to be able to form the requisite mental state.

Trial Counsel never spoke with Dr. Harrison about the results of the toxicology analysis. However, Trial Counsel testified that, had the case proceeded further in the process towards trial, he had plans to hire an independent toxicologist.

On cross-examination, Trial Counsel agreed that the potential effect of the allegedly threatening voice mails could be a "double-edged sword." He stated, "[I]t could be shown to support a self-defense theory in, in some respects, and then of course, it can also be shown that . . . [the Petitioner's] motivation for going over there was to specifically cause trouble." Trial Counsel also noted that the statement the Petitioner gave to police did not support a theory of self-defense. Trial Counsel testified that, had the case proceeded further towards trial, he would have listened to the voice mail recordings.

Trial Counsel testified that extensive negotiations involving multiple offers and counter-offers led to the plea agreement that ultimately was entered. He thoroughly discussed each offer with the Petitioner, and the Petitioner was satisfied with the final agreement.

On re-direct examination, Trial Counsel stated that he had discussed with the Petitioner the potential effect that the alcohol and drugs in his system at the time of the shooting could have on establishing the requisite mental state. However, Trial Counsel admitted that he did not know the precise content of alcohol or other substances in the Petitioner's blood. Trial Counsel also confirmed that he had discussed the voice mails "at length" with both the Petitioner and the Petitioner's family.

The Petitioner testified that he understood "for the most part" the rights that he waived by choosing to plead guilty. He confirmed that he had a history of mental health issues and substance abuse, and he had discussed those issues with Trial Counsel. Trial Counsel

-4-

provided him a copy of "the majority" of the discovery in the instant case. The Petitioner also testified that he was aware of each of the offers and counter-offers that were made during plea negotiations. He informed Trial Counsel that he wanted a plea agreement for twenty years, reasoning, "[T]here was a loss of life and . . . I should . . . do some time for it, but I didn't feel that the circumstances and, of the situation that it deemed anything more than that." Trial Counsel also discussed with him that his prior felony conviction for reckless endangerment could negatively impact the sentence to which the State was willing to agree.

The Petitioner stated that he and Trial Counsel discussed how the presence of drugs and alcohol in his system at the time of the shooting "could be relevant to premeditation." He understood that his voluntary intoxication and the fact that he was able to operate a vehicle on the night of the shooting could have been relevant had this case gone to trial. However, "there wasn't a whole lot of talk [with Trial Counsel] about going to trial," and he did not believe that Trial Counsel "had ever planned on actually having a trial."

Regarding the voice mails in question, the Petitioner testified, "I don't remember exactly what was on there, but I do know it was on the lines of, 'Come on over here, we've got some guns,' and, 'We'll kill you and kill your family.'" The Petitioner testified that, prior to the shooting, he had been in a physical altercation with Nick Huskey, a friend of Hewitt's. The Petitioner could not remember if the voice mails in question were from Hewitt or Huskey.

The Petitioner testified that he wanted Trial Counsel to go "into more depth about, you know, how intoxicated I was, and how maybe I could have perceived the threat under those conditions." He did not feel that Trial Counsel advised him fully of the facts and circumstances of the case or of the evidence against him. He believed that, had this case gone to trial, he could have received a lesser sentence than he received pursuant to the plea agreement.

On cross-examination, the Petitioner identified a waiver of trial by jury form, a waiver of appeal form, and the plea agreement. He admitted that he signed all three of those documents and confirmed that Trial Counsel had gone over each form with him prior to his signing them. He confirmed that, any time he had asked for a missing piece of discovery, Trial Counsel would make an effort to get him a copy. Trial Counsel informed him that, were he to go to trial, he faced the possibility of being convicted of first degree murder and receiving a sentence of life without the possibility of parole. He confirmed that he did not "know for sure" whether it was Hewitt or Huskey who left the voice mails. The Petitioner believed that guns were hidden throughout the residence, and he wanted Trial Counsel to investigate that possibility. The Petitioner agreed that, although Trial Counsel advised him to accept the plea agreement, the ultimate decision to plead guilty was his alone.

-5-

Following the hearing, the post-conviction court issued an order denying post-conviction relief. The Petitioner timely appealed, arguing that Trial Counsel was ineffective in failing to properly instruct the Petitioner as to a theory of self-defense, failing to properly investigate the scene of the crime, and failing to investigate the allegedly threatening voice mails left on his phone.

## Standard of Review

Relief pursuant to a post-conviction proceeding is available only where the petitioner demonstrates that his or her "conviction or sentence is void or voidable because of the abridgment of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States." Tenn. Code Ann. § 40-30-103 (2006). To prevail on a post-conviction claim of a constitutional violation, the petitioner must prove his or her allegations of fact by "clear and convincing evidence." Tenn. Code Ann. § 40-30-110(f) (2006); see Momon v. State, 18 S.W.3d 152, 156 (Tenn. 1999). This Court will not overturn a post-conviction court's findings of fact unless the preponderance of the evidence is otherwise. Pylant v. State, 263 S.W.3d 854, 867 (Tenn. 2008); Sexton v. State, 151 S.W.3d 525, 531 (Tenn. Crim. App. 2004). We will defer to the post-conviction court's findings with respect to the witnesses' credibility, the weight and value of their testimony, and the resolution of factual issues presented by the evidence. Momon, 18 S.W.3d at 156. With respect to issues raising mixed questions of law and fact, however, including claims of ineffective assistance of counsel, our review is de novo with no presumption of correctness. See Pylant, 263 S.W.3d at 867-68; Sexton, 151 S.W.3d at 531.

## Analysis

The Sixth Amendment to the United States Constitution and article I, section 9 of the Tennessee Constitution guarantee a criminal defendant the right to representation by counsel at trial.[1] Both the United States Supreme Court and the Tennessee Supreme Court have recognized that this right is to "reasonably effective" assistance, which is assistance that falls "within the range of competence demanded of attorneys in criminal cases." Strickland v. Washington, 466 U.S. 668, 687 (1984); see also Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975). The deprivation of effective assistance of counsel at trial presents a claim cognizable under Tennessee's Post-Conviction Procedure Act. See Tenn. Code Ann. § 40-30-103; Pylant, 263 S.W.3d at 868.

---

[1] The Sixth Amendment right to counsel is applicable to the States through the Fourteenth Amendment to the United States Constitution. See Gideon v. Wainwright, 372 U.S. 335, 342 (1963); State v. Howell, 868 S.W.2d 238, 251 (Tenn. 1993).

In order to prevail on a claim of ineffective assistance of counsel, the petitioner must establish two prongs: (1) that counsel's performance was deficient and (2) that the deficient performance prejudiced the defense. See Strickland, 466 U.S. at 687; Goad v. State, 938 S.W.2d 363, 370 (Tenn. 1996). The petitioner's failure to establish either prong is fatal to his or her claim of ineffective assistance of counsel. Goad, 938 S.W.2d at 370. Accordingly, if we determine that either prong is not satisfied, we need not consider the other prong. Id.

To establish the first prong of deficient performance, the petitioner must demonstrate that his lawyer's "acts or omissions were so serious as to fall below an objective standard of 'reasonableness under prevailing professional norms.'" Vaughn v. State, 202 S.W.3d 106, 116 (Tenn. 2006) (quoting Strickland, 466 U.S. at 688). Our supreme court has explained that:

> [T]he assistance of counsel required under the Sixth Amendment is counsel reasonably likely to render and rendering reasonably effective assistance. It is a violation of this standard for defense counsel to deprive a criminal defendant of a substantial defense by his own ineffectiveness or incompetence. Defense counsel must perform at least as well as a lawyer with ordinary training and skill in the criminal law and must conscientiously protect his client's interest, undeflected by conflicting considerations.

Baxter, 523 S.W.2d at 934-35 (quoting Beasley v. United States, 491 F.2d 687, 696 (6th Cir. 1974)). When a court reviews a lawyer's performance, it "must make every effort to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's conduct, and to evaluate the conduct from the perspective of counsel at that time." Howell v. State, 185 S.W.3d 319, 326 (Tenn. 2006) (citing Strickland, 466 U.S. at 689). Additionally, a reviewing court "must be highly deferential and 'must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.'" State v. Honeycutt, 54 S.W.3d 762, 767 (Tenn. 2001) (quoting Strickland, 466 U.S. at 689). We will not deem counsel to have been ineffective merely because a different strategy or procedure might have produced a more favorable result. Rhoden v. State, 816 S.W.2d 56, 60 (Tenn. Crim. App. 1991). We recognize, however, that "deference to tactical choices only applies if the choices are informed ones based upon adequate preparation." Cooper v. State, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992) (citing Hellard v. State, 629 S.W.2d 4, 9 (Tenn. 1982)).

As to the prejudice prong, the petitioner must establish a "reasonable probability that but for counsel's errors the result of the proceeding would have been different." Vaughn, 202 S.W.3d at 116 (citing Strickland, 466 U.S. at 694). In the context of a guilty plea, our analysis of this prong

focuses on whether counsel's constitutionally ineffective performance affected the outcome of the plea process. In other words, in order to satisfy the "prejudice" requirement, the [petitioner] must show that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial.

Hill v. Lockhart, 474 U.S. 52, 59 (1985); see also Calvert v. State, 342 S.W.3d 477, 486 (Tenn. 2011).

The Petitioner first argues that Trial Counsel was ineffective in "failing to develop and fully advise" him on a theory of self-defense. Specifically, he asserts that his "belief that a real danger existed at the time he shot decedent would have been impacted by his mental health, his degree of intoxication and his level of stress at the time of the shooting." He also asserts that he "was unaware of this possible defense."

Both the testimony of Trial Counsel and the Petitioner show that there was a significant amount of discussion between the two regarding both the Petitioner's history of substance abuse as well as his history of mental illness. Two mental evaluations of the Petitioner were performed prior to the Petitioner's pleading guilty, and the reports of both evaluations are contained in the record. The mental evaluation ordered by the State concluded both that the Petitioner was competent to stand trial and that the Petitioner "was able to appreciate the nature or wrongfulness" of his acts at the time of the shooting. Likewise, the independent mental evaluation performed by Dr. Brown concluded that "the available evidence does not support a mental defense." Furthermore, the Petitioner testified that he and Trial Counsel discussed how the presence of drugs and alcohol in his system at the time of the shooting "could be relevant to premeditation."

Nothing in the record suggests that Trial Counsel's representation was deficient in this regard. On the contrary, the record shows that Trial Counsel and the Petitioner discussed the potential impact that his mental illness and intoxication had on his mental state at the time of the shooting and that Trial Counsel in fact consulted an independent expert with the aim to develop that potential defense. Therefore, the Petitioner failed to demonstrate that Trial Counsel's "acts or omissions were so serious as to fall below an objective standard of 'reasonableness under prevailing professional norms.'" Vaughn, 202 S.W.3d at 116 (quoting Strickland, 466 U.S. at 688). Accordingly, the Petitioner is entitled to no relief on this basis. Having found that the Petitioner has failed to establish Trial Counsel's deficient performance, we need not consider the prejudice prong. Goad, 938 S.W.2d at 370.

The Petitioner next contends that Trial Counsel was ineffective in failing to investigate allegedly threatening voice mails left on the Petitioner's phone and by failing to investigate the crime scene. The Petitioner testified that the voice mails in question

contained threats and that Hewitt kept guns hidden at the residence which were not uncovered by police. However, the Petitioner did not present the voice mails at the post-conviction hearing. In fact, the Petitioner testified that he could not be certain that the voice mails were even left by Hewitt. Furthermore, the Petitioner did not present any evidence at the post-conviction hearing, aside from his own speculation, that any exculpatory evidence would have been uncovered upon Trial Counsel's inspection of the crime scene.

In the context of a post-conviction petition, this Court has said that "[i]t is elementary that neither a trial judge nor an appellate court can speculate or guess on the question of . . . what a witness's testimony might have been if introduced by defense counsel." Black v. State, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990). Therefore, "[w]hen a petitioner contends that trial counsel failed to discover, interview, or present witnesses in support of his defense, these witnesses should be presented by the petitioner at the evidentiary hearing." Id. "As a general rule, this is the only way the petitioner can establish that . . . the failure to [adduce the evidence] resulted in the denial of critical evidence which inured to the prejudice of the petitioner." Id. By analogy, we cannot speculate or guess on the question of what the voice mails might have contained had they been introduced in the post-conviction hearing nor can we speculate as to what a search of the crime scene might have uncovered. See Russell Lenox Hamblin v. State, No. M2012-01649-CCA-R3-PC, 2013 WL 5371230, at *7 (Tenn. Crim. App. Sep. 26, 2013). Furthermore, we cannot speculate as to the impact this information might have had on Trial Counsel's representation of the Petitioner or on the Petitioner's decision to plead guilty. See Wade v. State, 914 S.W.2d 97, 102 (Tenn. Crim. App. 1995).

Based on the record before us, the Petitioner has not established a reasonable probability that, had Trial Counsel listened to the voice mails or investigated the crime scene, the result of the proceeding would have been different. Vaughn, 202 S.W.3d at 116 (citing Strickland, 466 U.S. at 694). That is, the Petitioner has failed to show that either inquiry by Trial Counsel would have resulted in his decision not to plead guilty and an insistence on proceeding to trial. See Lockhart, 474 U.S. at 59; Calvert, 342 S.W.3d at 486. Therefore, the Petitioner has failed to establish that he was prejudiced by Trial Counsel's failure to listen to the voice mails or investigate the crime scene. Accordingly, the Petitioner is entitled to no relief on this basis. Because we have determined that the prejudice prong has not been satisfied, we need not address whether Trial Counsel's representation in this regard was deficient. See Goad, 938 S.W.2d at 370.

## CONCLUSION

For the reasons set forth above, we affirm the judgment of the post-conviction court.


_____
JEFFREY S. BIVINS, JUDGE